UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_12/10/2020___
```

------------------------------------------------------------X
RODGER JENKINS and GREGORY JONES,        :
                                         :
                          Plaintiffs,    :
                                         :
              -against-                  :          19-CV-1774 (VEC)
                                         :
                                         :          OPINION AND ORDER
XPRESSPA GROUP, INC.,                    :
                                         :
                          Defendant.     :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       This case arises from an inartfully drafted agreement pursuant to which Defendant

acquired Plaintiffs' company. Shortly after the initial acquisition, Defendant sold the company

to a third party. The parties' dispute concerns whether the subsequent sale triggered a provision

in the original contract providing for accelerated earnout compensation and, if the provision was

triggered, the amount Defendant owes for its alleged breach. Plaintiffs and Defendant have

cross-moved for summary judgment. For the reasons discussed below, Plaintiffs' motion for

summary judgment is GRANTED IN PART and DENIED IN PART; Defendant's motion for

summary judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

       Plaintiffs Rodger Jenkins and Gregory Jones jointly owned Excalibur Integrated Systems,

Inc. ("Excalibur"), a technology equipment company, on an 80-20 basis. Def. 56.1 Response ¶

---

[1]       All facts stated herein that are drawn from the parties' Local Civil Rule 56.1 Statements are undisputed
unless otherwise noted. The Court will refer to the relevant submissions as follows: Plaintiffs' Statement of
Undisputed Material Facts in support of their motion for summary judgment, Dkt. 111, as "Pl. 56.1 Stmt.";
Defendant's Local Rule 56.1 Counterstatement of Material Facts and Statement of Additional Material Facts, Dkt.
117, as "Def. 56.1 Response"; Plaintiffs' Reply to Defendant XpresSpa's Counterstatement of Material Facts and
Response to Defendant XpresSpa's Statement of Additional Material Facts, Dkt. 123, as "Pl. 56.1 Reply"; Plaintiffs'
Third Amended Complaint, Dkt. 81, as "TAC"; Plaintiffs' Memorandum of Law in support of their motion for
summary judgment, Dkt. 109, as "Pl. Mem."; Defendant's Memorandum of Law in opposition to Plaintiffs' motion

18; Pl. 56.1 Reply ¶ 18.  On February 2, 2017, Defendant XpresSpa Group, Inc. ("XpresSpa"),

then operating as FORM Holdings Corp., and Plaintiffs executed a Stock Purchase Agreement

("SPA"), pursuant to which XpresSpa acquired Excalibur.  Def. 56.1 Response ¶ 35; Pl. 56.1

Reply ¶ 35.  After the acquisition, Excalibur was combined with Group Mobile International,

Inc. ("Group Mobile"), a subsidiary of XpresSpa.  Def. 56.1 Response ¶ 36; Pl. 56.1 Reply ¶ 36.

At or around the time of the sale, Jenkins signed an employment agreement with Group Mobile,

which was incorporated into the SPA as Exhibit C.  Def. 56.1 Response ¶ 37; Pl. 56.1 Reply ¶

37; SPA Ex. C.  Jenkins' employment agreement does not include any sales targets nor were any

sales targets otherwise established for Jenkins during his employment by Group Mobile.  Pl. 56.1

Stmt. ¶¶ 8–9; Def. 56.1 Response ¶¶ 8–9; *see also* SPA Ex. C.

The SPA included a provision pursuant to which Plaintiffs would earn additional

compensation if certain performance targets were satisfied during the three years subsequent to

the acquisition.  Section 2.3 of the SPA, titled "Subsequent Consideration," provides:

> After Closing, as additional consideration for the purchase and sale of Shares as set
> forth in Section 2.1 herein, each year until the third anniversary of the Closing (the
> "Subsequent Transfer Period"), the Buyer will, each April 1, pay $500,000 . . . to
> the Sellers . . . for each $2,000,000 of cumulative Gross Profit of sales generated
> by those accounts set forth on Exhibit B hereto (the "Seller Accounts"), until the
> cumulative Gross Profit of sales generated by the Seller Accounts in the Subsequent
> Transfer Period reaches $6,000,000. . . .

SPA § 2.3.[2]  The effect of § 2.3 was that Plaintiffs could earn up to $1,500,000 in subsequent

consideration ("Subsequent Consideration") if Excalibur's legacy accounts generated $6,000,000

---

for summary judgment, Dkt. 121, as "Def. Mem."; Plaintiffs' Response to Defendant's cross-motion for summary
judgment, Dkt. 122, as "Pl. Response"; the Stock Purchase Agreement, Dkt. 81-1, as "SPA"; and the
Acknowledgement, Dkt. 120-14, as "Acknowledgement."

[2]      The SPA allowed the Buyer, at its discretion, to satisfy this obligation in cash or in its securities.  If the
Buyer elected to pay in shares, the SPA included a mechanism for determining how to value the shares.

in gross profit in the three years following XpresSpa's acquisition of Excalibur.  *See* Pl. Mem. at

3.[3]

The SPA also contained a provision that established the terms for acceleration of the

Subsequent Consideration if XpresSpa sold Group Mobile.  Section 2.5 of the SPA, titled

"Acceleration of Consideration," provides:

> Upon a Change of Control of the Company's subsidiary, Group Mobile
> International LLC ("Group Mobile"), if (a) more than 25% of Group Mobile's
> aggregate revenue is then derived from accounts attributable to the efforts of the
> Company and/or the Sellers, and (b) if Rodger Jenkins has met all applicable sales
> targets pursuant to his employment by Group Mobile, as agreed to by Rodger
> Jenkins and Group Mobile in connection with the employment agreement attached
> herein as Exhibit C, then (i) within sixty (60) Business Days of such Change of
> Control, Buyer shall pay the Sellers 50% of the [S]ubsequent [C]consideration . . .
> that would have been transferred from the Buyer to the Sellers, in connection with
> Section 2.3 herein, as if the cumulative Gross Profit of sales generated by the Seller
> Accounts, from Closing until the third anniversary of the Closing, had reached
> $6,000,000, less the [S]ubsequent [C]onsideration already transferred from the
> Buyer to the Sellers under Section 2.3 herein; and (ii) Buyer shall cause the
> purchaser of Group Mobile, as a condition to such purchase, to assume the
> obligation to pay to the Sellers the remaining amount of [S]ubsequent
> [C]onsideration due under § 2.3, provided that Sellers meet all conditions and
> requirements in connection therewith.

SPA § 2.5.

In March 2018, XpresSpa agreed to sell Group Mobile to Route1, Inc. ("Route1").  Pl.

56.1 Stmt. ¶ 5; Def. 56.1 Response ¶ 5.  The parties agree that Group Mobile's sale to Route1

constituted a "Change of Control" as defined in SPA § 2.5 and that, at the time of the sale of

Group Mobile to Route1, more than 25% of Group Mobile's aggregate revenue was derived

from accounts attributable to the efforts of Excalibur and Plaintiffs.  Pl. 56.1 Stmt. ¶¶ 6–7; Def.

56.1 Response ¶¶ 6–7.  It is also undisputed that, as part of the sale, XpresSpa did not require

---

[3]        The SPA set additional compensation if the gross profit from the Excalibur accounts reached $10 million.
That provision is not implicated by this litigation.

Route1 to assume the obligation to pay Plaintiffs any amount of accelerated consideration under § 2.5 of the SPA ("Accelerated Consideration"). Pl. 56.1 Stmt. ¶ 11; Def. 56.1 Response ¶ 11.

While negotiations were occurring between XpresSpa and Route1, Jenkins entered into an employment agreement with Route1 to remain a Group Mobile employee in the event that Route1 acquired Group Mobile. Def. 56.1 Response ¶ 76; Pl. 56.1 Reply ¶ 76. Jenkins also signed an "Acknowledgement," which states that "[o]ther than FORM Holdings Corp., neither Route1 Security Corporation, Route1 Inc., Group Mobile Int'l, LLC, nor any of their affiliates have any liability or obligation with respect to the SPA." Def. 56.1 Response ¶ 80; Pl. 56.1 Reply ¶ 80; *see also* Acknowledgement.

To date, neither XpresSpa nor Route 1 has paid any Accelerated Consideration to Plaintiffs. Pl. 56.1 Stmt. ¶ 10; Def. 56.1 Response ¶¶10–11; Pl. 56.1 Reply ¶¶ 11.

The parties disagree on whether the conditions of § 2.5 of the SPA were satisfied when Route1 acquired Group Mobile such that XpresSpa was obligated to pay Plaintiffs 50% of the Accelerated Consideration and to cause Route1 to assume an obligation to pay the remaining 50%. Specifically, the parties dispute whether the condition that Jenkins "met all applicable sales targets" was satisfied at the time of the sale. Pl. Mem. at 8; Def. Mem. at 10–11. Plaintiffs sued Defendant for breach of contract due to XpresSpa's refusal to pay $750,000 in Accelerated Consideration and for failing to cause Route1 to pay the remaining $750,000 of Accelerated Consideration allegedly due. *See* TAC ¶¶ 30–32. Plaintiffs seek compensatory damages and specific performance. TAC ¶ 32.

## DISCUSSION

### I.      Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment is appropriate on a contract-based claim "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir. 1996) (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) (internal quotation marks omitted)); *see also Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly."). Whether a contract is ambiguous is a question of law for the Court. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010); *see also Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982) ("[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court."). Summary judgment may also be appropriate if a contract is ambiguous but the extrinsic evidence of the parties' intent is so one-sided that it does not raise a genuine issue of fact for trial. *See Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329, 343 (S.D.N.Y. 2019); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000).

II.   **"Applicable Sales Targets" Is an Unambiguous Contract Term**

   A.  **The Court Did Not Previously Hold That the Contract Is Ambiguous**

As a threshold matter, the Court must address Defendant's argument that the Court has previously ruled that the contract is ambiguous as a matter of law, thus binding the parties for purposes of summary judgment and subsequent stages of litigation as law of the case.  "[T]he 'law of the case' doctrine is a rule of practice followed by New York courts that dictates that 'a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent states of the same litigation.'"  *Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) (quoting *In re Korean Air Lines Disaster*, 798 F. Supp. 755, 759 (E.D.N.Y. 1992)).

Defendant contends that, at the January 3, 2020, hearing on Defendant's motion for judgment on the pleadings, the Court decided that the language "applicable sales targets" was ambiguous as a matter of law.  In support of this argument, Defendant emphasizes the Court's statement that "[r]eading any ambiguity in plaintiffs' favor, the modifier 'applicable' means the agreement contemplated a scenario where no sales targets were 'capable of being applied.'" Hearing Tr. at 2, Dkt. 88.  Defendant also references the Court's invitation to Defendant to produce at trial extrinsic evidence of the parties' intent.  *Id.* at 12.

Defendant is mistaken in its belief that the Court decided as a matter of law that the contract is ambiguous with respect to the language concerning "applicable sales targets."  In stating that it would "[r]ead[] any ambiguity in plaintiffs' favor," the Court was not decreeing that the contract is ambiguous but was instead invoking the well-known standard for deciding a Rule 12(c) motion.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) ("In deciding a Rule 12(c) motion, we 'employ [] the same . . . standard applicable to dismissals

pursuant to [Rule] 12(b)(6).'") (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)); *see also Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) (noting that at the motion to dismiss stage, the court must "resolve any contractual ambiguities in favor of the [non-moving party]" (citing *Int'l Audiotext Network v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  That the Court did not explicitly state that the language "applicable sales targets" was ambiguous indicates that the Court did not intend to make a decision regarding the contract's ambiguity *vel non*.  Taken in conjunction with the Court's other statements at the January 3 hearing, it is abundantly clear that the Court has not yet ruled on whether the contract is ambiguous for purposes of the parties' summary judgment motions.  *See*, *e.g.*, Hearing Tr. at 14 ("What we're going to try is your contention that the contract is ambiguous."); *id.* at 15 ("[Defendant's] best argument is [that] the agreement is ambiguous, and, therefore, you're going to put on evidence of what the parties intended.  If you can't do that, you're not going to prevail.").

Further, the Court's discussion of what extrinsic evidence Defendant must produce to demonstrate the parties' intent did not imply that the Court had determined that the Defendant would prevail on step one of its argument—namely, that the contract is ambiguous.  These statements must be considered in the context in which they were made.  The Court expressly informed Defendant that if the contract were unambiguous, Defendant would lose.  *See id.* at 15.  Therefore, the Court suggested that Defendant pursue a different tactic: to argue that the contract is ambiguous and that extrinsic evidence demonstrates that sales targets are an essential term of the agreement.  *See id.* at 14–15.  For these reasons, the Court rejects Defendant's contention and must now determine whether the contractual term "applicable sales targets" is ambiguous.

### B.  Applicable Law

"[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted).  "[A] written agreement that is complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms, without the aid of extrinsic evidence." *Law Debenture Tr.*, 595 F.3d at 467 (cleaned up); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract, . . . the court is not to consider any extrinsic evidence as to the parties' intentions.") (citations omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Abboud*, 568 F.3d at 396 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989)).  On the other hand, a contract is ambiguous if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (cleaned up)).  "Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate." *Thompson*, 896 F.2d at 721 (citing *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989)).

### C.  Application to This Case

Defendant contends that one of the conditions in § 2.5 of the SPA necessary to trigger Accelerated Consideration is ambiguous.  The specific language of the condition at issue reads: "if Rodger Jenkins has met *all applicable sales targets* pursuant to his employment by Group

Mobile, as agreed to by Rodger Jenkins and Group Mobile in connection with the employment agreement attached herein as Exhibit C." SPA § 2.5 (emphasis added). According to Defendant, the term "all applicable sales targets" is ambiguous, and, based on extrinsic evidence, the only reasonable understanding of "applicable sales targets" is that the parties intended for sales targets to be an essential term of the contract.

Because "applicable" is undefined in the SPA, the Court gives the word "applicable" its ordinary meaning. *See MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 455 (S.D.N.Y. 2016) (giving plain meaning to terms undefined in a contract). The ordinary meaning of "applicable" is "capable of being applied." *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (defining "applicable" as "capable of being applied" or "appropriate, relevant, suitable, or fit"); *see also* Webster's Third New International Dictionary 105 (2002) ("Applicable" means "capable of being applied: having relevance" or "fit, suitable, or right to be applied: appropriate."); New Oxford American Dictionary 74 (2d ed. 2005) ("relevant or appropriate"); 1 Oxford English Dictionary 575 (2d ed. 1989) ("[c]apable of being applied" or "[f]it or suitable for its purpose, appropriate").

In the context of § 2.5, therefore, a sales target is "applicable" if the sales target is "capable of being applied" to Jenkins in his employment by Group Mobile. In this setting, sales targets "capable of being applied" are those that were agreed to by Jenkins and Group Mobile. *See* SPA § 2.5 (defining "applicable sales targets" as those "agreed to by Rodger Jenkins and Group Mobile in connection with [Jenkins'] employment agreement"). Relying on the plain meaning of "applicable," the existence of sales targets is not an essential term of the contract. Quite the contrary, the plain language clearly contemplates a scenario in which there are no "applicable sales targets" to meet. That scenario could exist under the SPA if Group Mobile or

Jenkins failed to propose sales targets or if they could not reach an agreement on sales targets. The only reasonable reading of the requirement that Jenkins meet "all applicable sales targets" is that Jenkins was required to satisfy any extant sales targets established by agreement between Jenkins and Group Mobile; those are the sales targets that are "capable of being applied" to Jenkins. If no such targets exist, then, by definition, there are no "applicable" sales targets. In short, the Court finds that this provision is not ambiguous.

Defendant accepts that "applicable" means "capable of being applied" but argues that the word "applicable" is meaningful only when there are two or more items capable of being applied. Def. Mem. at 19. Defendant further asserts that if the contract actually contemplated the possibility that no sales targets might be set, a more natural writing would have included a conditional phrase, such as "if applicable," to show that the parties contemplated that sales targets might not exist. *Id.* at 20.

Defendant's argument is contrary to the plain meaning of the word "applicable" and, in effect, reads "applicable" out of the contract altogether. Courts will not find ambiguity when a party's suggested interpretation strains the language of a contract beyond its reasonable and ordinary meaning. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Using Defendant's reading, "applicable" would add no meaning to the contract unless there were multiple competing sales targets that could be applied to Jenkins. Defendant's preferred interpretation of "applicable" does not comport with the eminently foreseeable scenario in which Jenkins and Group Mobile set only one sales target for Jenkins to meet. The Court is reluctant to accept a reading that renders the language of the contract largely superfluous in this way; Defendant's reading renders the term "applicable" entirely superfluous.

The Court is similarly unpersuaded by Defendant's attempt to distinguish a requirement that Jenkins meet "all applicable sales targets" from a requirement that Jenkins meet "all sales targets, if applicable."  Both formulations express the same requirement that Jenkins meet any sales targets that are "capable of being applied" to him in his employment by Group Mobile.  As discussed above, "applicable sales targets" means sales targets that are capable of being applied; sales targets are "applicable" only if they exist and can be applied to the situation at hand.

The requirement that Jenkins meet "applicable sales targets" is unambiguous and plainly contemplates a scenario in which the parties did not agree upon sales targets.  Because the agreement contemplated the scenario that there were no sales targets to meet, sales targets were not an essential term of the contract.  Thus, § 2.5 of the SPA is enforceable despite the parties' failure to establish sales targets applicable to Jenkins.

### III.     Plaintiffs Satisfied Their Requirements Under § 2.5 of the SPA

For Plaintiffs to be entitled to Accelerated Consideration, the SPA required that (1) there be a "Change of Control" of Group Mobile; (2) more than 25% of Group Mobile's aggregate revenue be derived from legacy Excalibur accounts; and (3) Jenkins met all applicable sales targets.  SPA § 2.5.  The parties agree that a "Change of Control" occurred when XpresSpa sold Group Mobile to Route1 and that more than 25% of Group Mobile's aggregate revenue was then derived from the legacy Excalibur accounts.  Pl. 56.1 Stmt. ¶¶ 6–7; Def. 56.1 Response ¶¶ 6–7. Therefore, to the extent Jenkins met "all applicable sales targets," Plaintiffs were entitled to Accelerated Consideration.

Because sales targets are not an essential term, the parties' failure to agree on Jenkins' sales targets does not mean that Plaintiffs failed to satisfy the conditions of § 2.5 that trigger Accelerated Consideration.  To the contrary, the absence of any sales targets that could be

applied to Jenkins in his employment at Group Mobile necessitates a finding that Jenkins met

"all *applicable* sales targets pursuant to his employment by Group Mobile."  SPA § 2.5.

Plaintiffs have, therefore, demonstrated that Accelerated Consideration was due to them under

the SPA at the time of the sale of Group Mobile to Route1.

### IV.     Defendant's Obligations Under § 2.5 of the SPA

Because the Court finds that Plaintiffs satisfied the three requirements of § 2.5, Plaintiffs

are entitled to Accelerated Consideration.  The question next becomes the extent of Defendant's

obligations under the SPA.  Pursuant to § 2.5, if the conditions were satisfied, the SPA imposed

two independent obligations on Defendant:

> (i) within sixty (60) Business Days of such Change of Control, Buyer [Defendant]
> shall pay the Sellers [Plaintiffs] 50% of the [S]ubsequent [C]onsideration . . .  that
> would have been transferred from the Buyer to the Sellers, in connection with
> Section 2.3 herein, as if the cumulative Gross Profit of sales generated by the
> Seller Accounts, from Closing until the third anniversary of the Closing, had
> reached $6,000,000, less the [S]ubsequent [C]onsideration already transferred
> from the Buyer to the Sellers under Section 2.3 herein; and (ii) Buyer shall cause
> the purchaser of Group Mobile, as a condition to such purchase, to assume the
> obligation to pay to the Sellers the remaining amount of [S]ubsequent
> [C]onsideration due under § 2.3, provided that Sellers meet all conditions and
> requirements in connection therewith.

### A.  Defendant Breached § 2.5(i) by Failing to Pay Accelerated Consideration

The parties agree that if § 2.5 is enforceable, Defendant is obligated under § 2.5(i) to pay

Plaintiffs 50% of the maximum Subsequent Consideration that Plaintiffs might have earned

under § 2.3.  *See* Def. 56.1 Response ¶ 4; *see also* Def. Mem. at 24 (disputing only Plaintiffs'

claim for the "second $750,000" if the Court decides that sales targets were not an essential

term); *id.* at 27; SPA § 2.5.  As § 2.5 directs, this amount is calculated by assuming gross profits

generated by Excalibur accounts would have reached $6,000,000 within three years of the sale of

Excalibur to XpresSpa.  *See* SPA § 2.5.  If Excalibur accounts had produced $6,000,000 in gross

profit during the earnout period, Plaintiffs would have been entitled to $1,500,000 in Subsequent Consideration.  *Id*.  Because Defendant sold Group Mobile during the earnout period, § 2.5 required XpresSpa to pay Plaintiffs 50% of $1,500,000 or $750,000 within sixty days of the sale of Group Mobile as Accelerated Consideration.

Defendant acknowledges that it did not pay Plaintiffs any Accelerated Consideration after the sale of Group Mobile.  Pl. 56.1 Stmt. ¶ 10; Def. 56.1 Response ¶ 10.  Defendant therefore breached the agreement by failing to pay Plaintiffs $750,000 within sixty days of Route1's acquisition of Group Mobile.

**B.  Defendant's Failure to Cause Route1 to Assume an Obligation to Pay**

Because the conditions triggering § 2.5 were satisfied for the reasons discussed above, Defendant was obligated under § 2.5(ii) to "cause the purchaser of Group Mobile, as a condition to such purchase, to assume the obligation to pay to the Sellers the remaining amount of [S]ubsequent [C]onsideration due under § 2.3, provided that Sellers me[]t all conditions and requirements in connection therewith."  SPA § 2.5.  Defendant failed to do so.  Pl. 56.1 Stmt. ¶ 11; Def. 56.1 Response ¶ 11.  That creates two issues.  First, independent of Defendant's breach of § 2.5(i) by failing to pay $750,000 in Accelerated Consideration upon the sale of Group Mobile, the Court must determine whether Defendant breached its duty to cause Route1 to assume an obligation to pay any remaining Accelerated Consideration due under § 2.5(ii). Second, even if there was a duty that Defendant breached, the Court must consider whether the Acknowledgement Jenkins signed precludes Plaintiffs from recovering damages for that breach.

The Court concludes that § 2.5(ii) is ambiguous, which prevents the Court from determining on summary judgment whether Defendant breached § 2.5(ii).  Notwithstanding this ambiguity, however, the Court finds that, by signing the Acknowledgement, Plaintiff Jenkins

waived his right to recover for any potential breach of § 2.5(ii) by Defendant.  Plaintiff Jones, however, is not barred from recovering if he can show a breach of § 2.5(ii) at trial.

### 1.   § 2.5(ii) Is Ambiguous

At the outset, the Court must determine whether Defendant committed a second breach of § 2.5 of the SPA by failing to cause Route1 to assume an obligation to pay Plaintiffs as a condition of its purchase of Group Mobile.  To find that Defendant breached § 2.5(ii) and that summary judgment should be awarded to Plaintiffs, the Court must determine that the contract is unambiguous with respect to the conditions giving rise to Defendant's duty.  Because the language of § 2.5(ii) is ambiguous, the Court cannot decide on summary judgment whether Defendant breached § 2.5(ii) or the extent of Defendant's liability, if any, for its breach.

The SPA directs that, if the conditions precedent to triggering Accelerated Consideration are met, "(ii) Buyer shall cause the purchaser of Group Mobile, as a condition to such purchase, to assume the obligation to pay to the Sellers the remaining amount of [S]ubsequent [C]onsideration due under § 2.3*, provided that Sellers meet all conditions and requirements in connection therewith*."  SPA § 2.5 (emphasis added).  The parties advance competing interpretations of this provision.

Defendant makes much of the language that any "remaining amount of the [S]ubsequent [C]onsideration due under Section 2.3" was owed only if Plaintiffs met "all conditions and requirements in connection therewith."  Def. Mem. at 27.  Defendant reads "all conditions and requirements in connection therewith" to refer back to § 2.3, thereby incorporating into § 2.5 the requirements for triggering a payout under § 2.3.  *See id.*  According to Defendant, in order for it to be obligated to cause Route1 to assume an obligation vis-à-vis Accelerated Consideration, Plaintiffs were required to meet the gross profit requirements of § 2.3, in addition to satisfying the conditions of § 2.5(a) and (b).  *See id.*  Therefore, under Defendant's theory, unless the

14

Excalibur accounts "generated at least $2 million in cumulative Gross Profit before the three-year anniversary of the Closing," Defendant had no duty to cause Route1 to assume an obligation to Plaintiffs. *Id.* By extension, the amount of any obligation Defendant was required to cause Route1 to assume would have to be determined in reference to § 2.3.

Plaintiffs argue that the phrase "the remaining amount of consideration due under § 2.3" refers to the 50% of Accelerated Consideration not paid by XpresSpa under § 2.5(i) because this "second $750,000" is the only Subsequent Consideration that is both remaining and due. Pl. Response at 15. Plaintiffs contend that Defendant's interpretation of § 2.5(ii) conflicts with the "clear intent of Section 2.5," which "exists because the parties understood that Plaintiffs, through no fault of their own, might not be given the opportunity to meet the cumulative gross profit benchmarks of Section 2.3." *Id.* at 16. According to Plaintiffs, it would be illogical for the parties to negotiate for a contractual provision that "account[s] for Plaintiffs being denied the opportunity to earn consideration by meeting the benchmarks of Section 2.3 that nevertheless requires them to hit those same benchmarks as a condition of payment." *Id.* In Plaintiffs' reading, therefore, the phrase "provided that [Plaintiffs] met all conditions and requirements in connection therewith" refers only to the other conditions of Accelerated Consideration as set out in § 2.5. *See id.*

The parties advance two plausible interpretations of ambiguous language in the SPA.[4] Under New York law, "the trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs.*, 959 F.2d at 428. When the language chosen by the parties is susceptible to more than one reasonable interpretation, the

---

[4]     The Court notes that although Defendant's interpretation is plausible, it has, as highlighted by Plaintiffs, some notable weaknesses.

court must look to extrinsic evidence of the parties' intent, and summary judgment is inappropriate. *See*, *e.g.*, *id.* at 429; *Thompson*, 896 F.2d at 721. This is just such a case—the language of § 2.5(ii) creates genuine ambiguity regarding whether the phrase "conditions and requirements in connection therewith" refers to the conditions listed earlier in § 2.5 (regarding a change of control, the portion of Group Mobile's revenue attributable to Excalibur accounts, and applicable sales targets) or to the independent conditions of § 2.3 (regarding the earnout consideration formula that depends on the gross profits of Excalibur accounts).

The Court may not at the summary judgment stage choose between reasonable interpretations of an ambiguous contract. On this issue, therefore, the Court must deny the parties' cross-motions for summary judgment and conduct a trial to determine the intended meaning of this ambiguous language.[5] *Cf. Heyman v. Com. & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) ("The well-settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (quoting 6 Moore's Federal Practice P.56.13 at 2247).

### 2. Jenkins' Recovery on the Alleged Breach of § 2.5(ii) is Foreclosed by the Acknowledgement

Even assuming Plaintiffs will be able to demonstrate that Defendant breached § 2.5(ii), Jenkins is foreclosed from recovering because the Acknowledgement bars him from seeking payment from Route1, regardless of whether XpresSpa caused Route1 to assume an obligation to Plaintiffs. Jenkins, therefore, cannot show damages resulting from the alleged breach of §

---

[5]     The parties seemingly anticipated that extrinsic evidence may have been necessary fully to comprehend the meaning of this provision. *See*, *e.g.*, Pl. Response at 17 n.9 ("To the extent XpresSpa argues ambiguity, the extrinsic evidence, in the form of its former CEO's testimony, supports Plaintiffs' reading.").

2.5(ii).  Jones' claim, however, would not have been barred by the Acknowledgement, which was signed by Jenkins in his personal capacity.

### a.  Applicable Law

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."  *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 400 (S.D.N.Y. 2018) (quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)).  "A plaintiff seeking damages for breach of contract . . . must demonstrate that the damages were caused by and are directly traceable to the . . . breach."  *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992) (quoting *Kenford Co. v. Erie Cty.*, 67 N.Y.2d 257, 261 (1986)).  A court will not grant a remedy for breach of contract if the non-breaching party cannot show any damages resulting from the breach.

A party may by contract waive his right to assert a claim or to seek payment of an obligation.  *See, e.g.*, *Fayard v. Henry Holt & Co.*, 726 F. Supp. 438, 447 (S.D.N.Y. 1989) ("It is axiomatic that the good faith settlement of a claim is adequate consideration.") (citing *Corbin on Contracts* §§ 139–40 (1963)).  "A waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it."  *City of New York v. State*, 40 N.Y.2d 659, 669 (1976) (internal quotations and citations omitted).  The waiver of a known right is not lightly presumed, *see Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988), and the burden of proving the validity of a waiver is on the party asserting the waiver, *see Rosenthal v. City of New York*, 283 A.D.2d 156, 160 (1st Dep't 2001).

### b.  Application to This Case

While there remains a question whether Plaintiffs can prove Defendant breached § 2.5(ii), Plaintiffs' claim may otherwise be foreclosed to the extent that Jenkins' Acknowledgement waived their ability to demand payment from Route1, as that would prevent Plaintiffs from demonstrating any damages resulting from XpresSpa's alleged breach.  During negotiations between XpresSpa and Route1, Jenkins signed the Acknowledgement, which states that "[o]ther than FORM Holdings Corp., neither Route1 Security Corporation, Route1 Inc., Group Mobile Int'l, LLC, nor any of their affiliates have any liability or obligation with respect to the SPA." The only reasonable interpretation of Jenkins' Acknowledgement is that Jenkins intended to surrender any claims he might have against Route1 arising from the SPA, including any obligation to make a payment pursuant to § 2.5(ii).

Plaintiffs have not argued that Jenkins was unaware of his right to require Route1 to honor the obligation that XpresSpa was contractually required to cause Route1 to assume. Indeed, it is difficult to understand why Jenkins would have signed the Acknowledgement if he did not intend to give up his right to pursue any payment of Accelerated Consideration from Route1.  By signing the Acknowledgement, Jenkins waived any claim he might have against Route1 for any obligations relating to the SPA.  Jenkins, therefore, cannot show damages flowing from Defendant's alleged breach because he agreed not to demand payment from Route1 even if Route1 had an obligation to pay Accelerated Consideration.[6]

---

[6]     Plaintiffs' argument that the Acknowledgement should not be interpreted to waive Jenkins' claims against XpresSpa with respect to the SPA, Pl. Mem. at 16, is correct but irrelevant.  While the Acknowledgement did not waive Jenkins' claims against XpresSpa with respect to the SPA, the Acknowledgement forecloses Jenkins' ability to show damages resulting from XpresSpa's alleged breach of § 2.5(ii); therefore, Jenkins' claim against XpresSpa on this issue, though not waived by the Acknowledgement, fails.

Jenkins' main argument in support of his position misses the mark.  He argues that XpresSpa's failure to cause Route1 to assume the obligation to Plaintiffs was a breach of Defendant's duty of good faith and that, because this alleged act of bad faith preceded Jenkins signing the Acknowledgement, the Acknowledgement is unenforceable.  The problem with Jenkins' argument is that XpresSpa's failure to cause Route1 to assume obligations under the SPA has no bearing on the validity of the agreement between Route1 and Jenkins embodied in the Acknowledgement.

The Acknowledgement was a bargain between Route1 and Jenkins supported by consideration—in exchange for Jenkins waiving potential claims against Route1 arising from the SPA, Route1 employed him.  The possibility that Jenkins was not fully appraised of the status of Route1's potential obligation to him does not undermine the validity of his agreement to forego any demand for payment from Route1.  An agreement to forego assertion of legal claims that are later discovered to be invalid is consideration if the forbearing party believes at the time of contract that the claim may be valid.  Restatement (Second) of Contracts § 74(1)(a) (Am. L. Inst. 1981); *see also Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (1993) ("To constitute sufficient consideration, for example, a party need only have a good-faith belief in the merit of its position.") (citation omitted); *Wahl v. Barnum*, 116 N.Y. 87 (1889) (stating that relinquishment of a disputed claim is still valid consideration even though the claim is in fact invalid).

When he signed the Acknowledgement, Jenkins is presumed to have understood that he was surrendering whatever right he had to collect payment from Route1 for whatever obligations it had arising from the SPA.[7]  The Acknowledgement is, in all respects, a valid contract between

---

[7]       The Court also notes that there does not appear to be any evidence that XpresSpa's failure to cause Route1 to assume an obligation to pay Plaintiffs in any way influenced or would have influenced Jenkins' decision to sign

Route1 and Jenkins pursuant to which Jenkins waived any claim against Route1; the alleged

prior breach by XpresSpa, even if done in bad faith, has no bearing on the validity of the

Acknowledgement.[8]  For these reasons, Jenkins has not been damaged by XpresSpa's alleged

breach of § 2.5(ii) of the SPA.

      Because the Acknowledgement was signed by Jenkins in his personal capacity rather than

in his capacity as Sellers' representative, however, the document does not bar Jones from seeking

damages for XpresSpa's breach of its duty under § 2.5(ii).[9]  The plain language of the

Acknowledgement supports this conclusion.  The Acknowledgement includes language such as

"I, Rodger Jenkins, represent on my behalf," and "my rights or obligations under the SPA,"

which compellingly demonstrates that Jenkins signed the document in his personal rather than in

any representative capacity.  *See* Acknowledgement.  In addition, the Acknowledgement

nowhere names Jenkins as the Sellers' representative or in any way suggests that Jenkins was

signing the document as Jones' representative.  In the absence of any evidence in the

Acknowledgement itself that Jenkins signed in his representative rather than individual capacity,

it must be assumed that Jenkins signed in his individual capacity.  *See* U.C.C. § 3-403 ("An

authorized representative who signs his own name to an instrument [] is personally obligated if

the instrument neither names the person represented nor shows that the representative signed in a

---

the Acknowledgement.  Indeed, Plaintiffs contend that Jenkins signed the Acknowledgement unaware of XpresSpa's alleged breach, further supporting the contention that Jenkins believed he was surrendering a known right.

[8]    This reasoning forecloses Plaintiffs' further claim that Defendant cannot rely on the Acknowledgement as a third-party beneficiary due to XpresSpa's alleged wrongful conduct; as explained above, XpresSpa's conduct had no bearing on Jenkins' decision to sign the Acknowledgement.  Therefore, XpresSpa's alleged breach of a duty of good faith, whether as a third-party beneficiary or otherwise, is irrelevant; because the effect of the valid Acknowledgement is that Jenkins cannot show damages resulting from Defendant's alleged breach of § 2.5(ii), Jenkins cannot make out a *prima facie* case of breach of contract; he is, therefore, barred from recovery regardless of the good or bad faith of Defendant.  *See Can't Stop Prods.*, 295 F. Supp. 3d at 400.

[9]    Section 12.3 of the SPA provides that any agreements made by the Sellers' representative (Jenkins) regarding the SPA or amendments or waivers to the SPA are binding on all Sellers.  *See* SPA § 12.3.

representative capacity."); Restatement (Second) of Agency § 155 (Am. L. Inst. 1958) ("It is presumed that an agent signs an instrument in his representative capacity "for a principal *whose name appears therein*. . . ." (emphasis added)).  The context in which Jenkins signed the Acknowledgement—during the course of employment negotiations between Jenkins and Route1—is further indication that it was as a personal waiver by Jenkins of his rights against Route1 regarding the SPA.  As noted above, a waiver of claims is not lightly presumed.  *Gilbert Frank*, 70 N.Y.2d at 968.  The Court therefore determines that Jones' right to recover for Defendant's potential breach of § 2.5(ii) was not waived by Jenkins' Acknowledgement.

## V.      Compensatory Damages Are the Appropriate Remedy for Breach of § 2.5(i)

Plaintiffs request that the Court award compensatory damages and order specific performance of the contract.  TAC ¶ 32.  Defendant argues that, if the Court should decide to award damages, it should be allowed to elect to pay the judgment in either cash or XpresSpa shares.  Def. Mem. at 28–29.  Defendant also argues that, in calculating the number of XpresSpa shares required to satisfy a judgment against it, Defendant should be permitted to use the price of XpresSpa shares at the time Plaintiffs' claim accrued rather than at the present (significantly reduced) share price.  *Id.*  For the reasons given below, the Court awards compensatory damages and rejects Defendant's argument regarding its ability to elect the form of payment to satisfy the judgment against it.

### A.  Applicable Law

The purpose of a judicial remedy for breach of contract is to protect the non-breaching party's "expectation interest," which is the party's interest in being put in the position it would have been in absent the breach.  Restatement (Second) of Contracts § 344.  There are two primary remedies for breach of contract: an award of damages or an order for specific

performance.  If there are no concerns about the sufficiency of damages to fully compensate the

non-breaching party, money damages are the preferred remedy for breach of contract.  *See*, *e.g.*,

*United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) ("[D]amages are always the default

remedy for breach of contract.") (plurality opinion); *Sokoloff v. Harriman Ests. Dev. Corp.*, 96

N.Y.2d 409, 415 (2001) ("In general, specific performance will not be ordered where money

damages would be adequate to protect the expectation interest of the injured party.") (internal

quotation marks omitted); Restatement (Second) of Contracts § 346 cmt. a ("Every breach of

contract gives the injured party a right to damages against the party in breach."); *id.* § 359(1)

("Specific performance or an injunction will not be ordered if damages would be adequate to

protect the expectation interest of the injured party.").  Specific performance is typically granted

when a court believes that money damages may be inadequate due to the difficulty of proving

damages to a reasonable certainty or the inability of the injured party to procure a suitable

substitute performance with a damages award.  *See Versatile Housewares & Gardening Sys., Inc.*

*v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 241 (S.D.N.Y. 2011) ("[Specific performance will]

be ordered . . . in cases in which damages will be difficult to prove with certainty, damages

would not allow the procurement of substitute performance, or the contract involves unique

goods or services.").

### B.  Application to This Case

There is no question that the Court can calculate the damages from Defendant's breach of

§ 2.5(i) with reasonable certainty—because the conditions triggering § 2.5(i) were met,

XpresSpa had a duty to pay Plaintiffs $750,000 in cash or securities within sixty days of the sale

of Group Mobile to Route1.  There is similarly no concern that damages will not fully

compensate Plaintiffs for Defendant's breach.  Courts regularly deny specific performance for

breaches of contract that can be fully remedied by money damages.  *See, e.g.*, *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (denying specific performance of a contract for the delivery of publicly traded stock because damages would provide an appropriate remedy). In this case, the very thing sought by Plaintiffs' request for specific performance is payment, not a unique service for which it may be difficult to find an appropriate substitute.  *Cf. Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 503 (S.D.N.Y. 2018) (disregarding contractual provision establishing specific performance as the default remedy for breach because "whether the Trustee's remedy is characterized as 'compensatory damages' . . . or 'specific performance' . . . has little practical significance given that the form of the relief (if not necessarily the quantum) is the same in each case: the payment of money to make Plaintiff whole") (quoting *Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prod., Inc.*, 958 F. Supp. 2d 488, 501 (S.D.N.Y. 2013)).  An award of money damages equivalent to the amount XpresSpa was obligated to pay under the contract (with added interest for the delay in payment) will put Plaintiffs in the same position they would have been in absent XpresSpa's breach.

Defendant's argument concerning its "negotiated right" to choose how to satisfy an obligation under the SPA § 2.5 is misplaced.  While the SPA did give Defendant the right to choose "in its sole discretion" between satisfying an obligation of Subsequent Consideration in either XpresSpa stock or cash, the SPA required Defendant to pay a sum certain of $750,000 (50% of the Subsequent Consideration that would have been due under SPA § 2.3 had Excalibur revenues reached $6,000,000 within the earnout period).  *See* SPA § 2.5.  A breach of a contract to pay a sum certain gives rise to a claim for damages in the amount of the sum certain.  *See*, *e.g.*,

*In re Simmons*, 247 U.S. 231, 239 (1918) (finding that a breach of a contract to bequeath a sum certain should give rise to a claim for damages in the amount of the sum certain).

The cases Defendant cites in support of its argument are unhelpful.  These cases correctly hold that, in order to put the non-breaching party in the same position in which it would have been absent the breach, courts will award damages equivalent to the loss to the non-breaching party measured at the date of the breach.  *Lucente*, 310 F.3d at 262 (stating that "contract damages are to be measured from the date of the breach"); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach."); *Cottam v. Glob. Emerging Cap. Grp.*, No. 16-CV-4584, 2020 WL 1528526, at *13 (S.D.N.Y. Mar. 30, 2020) (stating that "the correct measure of damages is calculated from the date of breach" and depends on "the market value [of the loss] at the time of the breach") (internal quotation marks omitted). In those cases, because the contracts were for shares or stock options rather than sums certain, the proper method to calculate damages was based on the price of the stock at the time the breach occurred.  *Lucente*, 310 F.3d at 262; *Simon*, 28 N.Y.2d at 145; *Cottam*, 2020 WL 1528526, at *13.  In this case, there is no need to reference the price of XpresSpa stock on the date Plaintiffs' cause of action accrued to determine the economic harm to Plaintiffs; per the SPA, Defendant owed Plaintiffs $750,000 in either stock or cash.  SPA § 2.5.  In other words, Defendant's breach caused Plaintiffs to suffer a loss of $750,000, not the loss of a contractually-allocated number of XpresSpa shares.  Defendant is liable for the economic harm caused by its breach; Defendant's argument that Plaintiffs' loss should be calculated based on the number of XpresSpa shares that

Plaintiffs would have received had Defendant fulfilled its obligation under § 2.5 by paying in stock is without merit.[10]

## VI.    Award of Attorneys' Fees Is Not Proper

Plaintiffs argue that Defendant has unreasonably litigated this case without a good faith defense and for that reason have requested that the Court order Defendant to pay Plaintiffs' attorneys' fees.  The Second Circuit has described a court's determination of the appropriateness of awarding sanctions such as attorneys' fees as "perhaps one of the most difficult and unenviable tasks for a court." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999).  This difficulty is due to the competing interests underlying an award of sanctions such as attorneys' fees.  On the one hand, "in our adversarial system, we expect a litigant and his or her attorney to pursue a claim zealously within the boundaries of the law and ethical rules." *Id.*  At the same time, though, in order to preserve judicial resources for cases between good-faith litigants, "a court should discipline those who harass their opponents and waste judicial resources by abusing the legal process." *Id.*  The Court is accordingly attentive to the weighty considerations required in evaluating Plaintiffs' request for attorneys' fees.  Because Defendant's arguments were not entirely meritless (indeed, one argument defeated, in part, Plaintiffs' motion for summary judgment), the Court declines to award attorneys' fees.

### A.  Applicable Law

Under the "American Rule," the starting assumption is that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance*

---

[10]      Because the Court awards damages based on the economic harm to Plaintiffs caused by Defendant's breach, the negotiated terms of the mechanics of XpresSpa's original obligation to pay are irrelevant.  As noted above, the Court awards money damages to put the non-breaching party in an economic position equivalent to the one in which it would have been absent the breach.  When the Court orders payment of money damages, a defendant may not choose the form of payment of the judgment against it.

*Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010).  Two exceptions to the American Rule are possibly relevant in this case.

First, by virtue of "the inherent power of the court to supervise and control its own proceedings, an exception to the American Rule has evolved which permits the court to award a reasonable attorneys' fee to the prevailing party when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (quoting *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)).  To ensure that fear of liability for attorneys' fees does not deter litigants with colorable claims from pursuing those claims, the Second Circuit interprets the bad faith requirement restrictively and requires clear evidence that the challenged actions were "entirely without color" and were taken "for reasons of harassment or delay or for other improper purposes" to justify an award of attorneys' fees based on the inherent authority of the court.  *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986).  Therefore, "[i]n order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.,* motivated by improper purposes such as harassment or delay."  *Schlaifer Nance*, 194 F.3d at 336.  "The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."  *Sierra Club v. U.S. Army Corps of Eng'rs,* 776 F.2d 383, 390 (2d Cir. 1985).

Second, 28 U.S.C. § 1927 authorizes a court to award attorneys' fees against an attorney who multiplies the proceedings in any case "unreasonably and vexatiously."  "Bad faith is the touchstone of an award under this statute."  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000) (quoting *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)).  "[B]ad faith may be inferred only if actions are so completely without merit as to require

the conclusion that they must have been undertaken for some improper purpose . . . ." *Emmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (internal quotation marks omitted).

The bad faith requirements for awards of attorneys' fees based on either the Court's inherent power or § 1927 are nearly identical. In practical terms, "the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Oliveri*, 803 F.2d at 1273. To impose sanctions under either authority, there must be clear evidence that (1) the claims at issue were entirely meritless and (2) the party acted for improper purposes. *Revson*, 221 F.3d at 79.

### B. Application to This Case

The facts of this case do not merit an award of attorneys' fees. Defendant's claims did not entirely lack a "colorable basis," *Schlaifer Nance*, 194 F.3d at 336, nor were they "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," *Emmon*, 675 F.3d at 143. To the contrary, the Court gave serious consideration to Defendant's arguments and was persuaded by Defendant's claim regarding the ambiguity of Defendant's liability for its failure to cause Route1 to assume an obligation to pay. Plaintiffs' contention that Defendant fabricated its legal arguments in order to avoid liability for a business decision not to pay the Plaintiffs, even if accepted by the Court, is not sufficient to justify an award of attorneys' fees under the high bar for such an award in the Second Circuit. The fact that Defendant has made legitimate (and even meritorious) legal arguments on at least some points is enough for Defendant to avoid an award of attorneys' fees given the conjunctive requirements of meritlessness and improper purpose. *See Revson*, 221 F.3d at 79. This logic

holds even if the legal arguments were developed after an initial business decision was made not to pay Plaintiffs; assuming *arguendo* that such action is an "improper purpose," the conjunctive test would not be satisfied because the allegedly improper purpose was not coupled with complete meritlessness. *Id.* While it is true that most of Defendant's arguments were rejected, the Court cannot find that Defendant's defense of this case was without colorable basis or completely meritless. Therefore, the Court declines to award attorneys' fees.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. At the conclusion of the case, the Court will enter judgment in favor of Plaintiffs for $750,000 (plus prejudgment interest of 9% per annum) in damages for Defendant's breach of § 2.5(i) of the SPA; Plaintiffs' request for attorneys' fees is denied. Defendant's motion for summary judgment is granted as to Plaintiff Jenkins' claim regarding Defendant's breach of § 2.5(ii) but denied as to Plaintiff Jones' claim regarding Defendant's breach of § 2.5(ii). The parties' pending motions *in limine* are dismissed as moot; the parties may file new motions to the extent relevant to the sole remaining issue for trial. The parties are directed to appear for a status conference via teleconference on **January 5, 2021, at 2:00 p.m.** The parties may dial-in using (888) 363-4749; access code 3121171#; security code 1774#. At that time, the Court will discuss next steps and will set a trial date. The Clerk of the Court is respectfully directed to close the open motions at Dkts. 98, 99, 100, 101, 108, and 116.

**SO ORDERED.**

Date:  December 10, 2020
     New York, New York

**VALERIE CAPRONI**
**United States District Judge**

28